2016 IL App (1st) 142376

FIRST DIVISION
MARCH 21, 2016

No. 1-14-2376

| | | |
|---|---|---|
| HELEN T. WILLIAMS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, | ) | |
| an Administrative Agency of the State of Illinois; | ) | |
| DIRECTOR OF EMPLOYMENT SECURITY; and | ) | No. 13 L 50663 |
| BOARD OF REVIEW, an Administrative Agency of the | ) | |
| State of Illinois, | ) | |
|     Defendants-Appellants | ) | |
| | ) | Honorable |
| (Levy Security Corporation, | ) | Carl Anthony Walker, |
|     Defendant). | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Liu and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendants-appellants, the Illinois Department of Employment Security (the Department), the Director of the Department (the Director), and the Board of Review of the Department (the Board) appeal from an order of the circuit court of Cook County, which reversed the Board's decision finding the plaintiff-appellee Helen Williams ineligible for unemployment benefits because she had been terminated for misconduct.

¶ 2        BACKGROUND

¶ 3 Williams was employed as a public safety officer by Levy Security Corporation (Levy) from September 2001 until her termination in June 2012. At the time of her termination, certain Levy public safety officers, including Williams, were assigned to provide security services on the campus of the Illinois Institute of Technology (IIT).

¶ 4    Levy terminated Williams' employment as a result of her conduct in the early morning hours of June 6, 2012.  Specifically, Levy claimed that Williams took an unauthorized break at a time that she was supposed to be actively patrolling the IIT campus.  Levy relied primarily on time-stamped video footage showing that at approximately 1:15 a.m., Williams and another Levy public safety officer congregated at a picnic table near a "7-11" convenience store on the IIT campus for approximately 35 minutes.   The video shows Williams and her coworker intermittently talking, eating, drinking coffee, and smoking cigarettes during that time. For approximately 20 minutes of that time, the video shows two additional unidentified individuals at the picnic table, whom Williams claims were IIT students.

¶ 5    Williams was terminated on June 7, 2012.   Shortly thereafter, Williams applied for unemployment insurance benefits with the Department.  Levy protested the claim for benefits, responding that Williams was "discharged for failing to perform job duties and falsifying [her] location while on duty."

¶ 6    The Department denied Williams' application for benefits on June 22, 2012.   The Department concluded that Williams was ineligible for benefits since she was terminated for "violation of a known and reasonable company rule," constituting "misconduct" pursuant to section 602(A) of the Unemployment Insurance Act (Act).  820 ILCS 405/602(A) (West 2012).

¶ 7    Williams appealed that determination.  A Department referee conducted a telephonic hearing on August 7, 2012.  The referee first heard testimony from Marcos Scott, assistant director of operations for Levy.  Scott testified that Williams was terminated because she and the other Levy employee congregated near the picnic table "for approximately 50 minutes" when neither was on a break.  Scott further testified that during that time, at about 1:25 a.m. Williams had radioed the call sign "74" which "means she should be actively patrolling the campus."

¶ 8 The referee also heard similar testimony from Ray Martinez, Levy's director of public safety. Like Scott, Martinez testified that Williams had remained near the picnic table for 50 minutes, during which time she had radioed that she was patrolling the campus. Martinez acknowledged that Williams had later told him that she had been speaking with two students about campus safety issues. However, Martinez testified that the students were there for "maybe five minutes" but that Williams had remained in the area for much longer.

¶ 9 Testifying on her own behalf, Williams testified that she was at the picnic table for "approximately 25 minutes." She testified that she spoke to two students sitting at the table for approximately 15 minutes because they had questions about campus safety.

¶ 10 After hearing this conflicting testimony, the referee noted that Levy had not produced the videotape, which would be "dispositive of the issue of how long [Williams] was there." The referee continued the hearing so that the videotape could be produced.

¶ 11 The hearing resumed on August 29, 2012, at which time the videotape was played before the referee. The video (which was included in the record on appeal) contains no audio, but displays a time stamp reflecting that it was recorded from approximately 1:12 to 1:52 a.m. The video shows that at approximately 1:15 a.m., Williams sat down at a table, joining another Levy public safety officer and two unidentified individuals. The video shows the officers eating, drinking, and smoking cigarettes and conversing with the other two individuals, who left the scene at approximately 1:33 a.m. After that time, Williams and the other public safety officer continued to talk and smoke at or near the table until approximately 1:51 a.m.

¶ 12 At the August 29, 2012, hearing, Williams acknowledged that the videotape showed that she was at the table for approximately 35 minutes. Williams also testified that she was "performing customer service" by speaking to the IIT students about campus safety. Williams

denied that she radioed that she was actively patrolling the campus at 1:25 a.m. Instead, she testified that she had radioed a "73" call sign, to indicate that she was giving "special attention to a specific area."

¶ 13    After the videotape was played, Scott offered to introduce a dispatch recording that purportedly included a 1:25 a.m. radio call from Williams giving a "74" call signal, which means that "she's actively patrolling the campus." Over Williams' objection, the referee allowed the audio to be played. Williams acknowledged that the recording contained her voice, but she stated she could not understand anything said in the recording other than "10-4."

¶ 14    On August 30, 2012, the referee rendered a decision against Williams, finding that she had been discharged for misconduct and was ineligible for benefits. The decision found that Williams "provided false information on June 6, 2012," and "persisted in her denials even after being confronted with a video of her activities." The referee found that Williams was sitting at the picnic table from 1:15 a.m. to 1:51 a.m. and that during the hearing she "identified her voice on the audio recording and confirmed that at 1:25 a.m. she reported that she was patrolling the campus."

¶ 15    Williams appealed to the Board. On December 31, 2012, the Board found that the record was inadequate to review the referee's decision, as it did not contain the audio tape of Williams' alleged 1:25 a.m. radio call. The Board remanded for the referee to "conduct a hearing de novo" and to issue a new decision upon the new hearing. As a result, the referee conducted a new hearing on February 6, 2013.

¶ 16    At the second hearing, the referee again heard testimony from Scott and Martinez. Scott testified that Williams was scheduled to work a shift on the IIT campus from 10:30 p.m. on June 5 until 7 a.m. on June 6, 2012. Scott testified that Williams' shift manager had observed

Williams and another officer sitting outside one of the campus buildings, and had then "directed a camera on their location" and recorded video footage. The video footage was again reviewed by the referee at the February 6, 2013 hearing.

¶ 17    Scott testified that although Levy's public safety officers are "entitled to an hour lunch and then any breaks as needed" during their shifts, Williams had not requested any break for the time corresponding to the video. Instead, he testified that about 1:25 a.m., "she called in that she was 74 campus wide, which denotes that she is actively patrolling the campus." Scott further claimed that Williams could be seen on the video speaking into her radio at that point.

¶ 18    Williams' attorney asked the referee to watch the portion of the video from 1:24 a.m. to 1:26 a.m. and note for the record "whether [Williams] got on her radio or not." The transcript reflects that the referee watched that portion of the video. Initially, the referee stated: "I can't tell if she's talking to someone. I can't tell what she's doing." However, the referee stated that at the point time-stamped 11 seconds past 1:25 a.m., "it looks like [Williams'] mouth is moving" while she was "facing away from the other three individuals" at the table.

¶ 19    Asked to describe harm caused by Williams' behavior, Scott testified that "By not actively patrolling the campus when she was supposed to Ms. Williams put [the campus'] safety in jeopardy."

¶ 20    On cross-examination, Scott testified that officers are "entitled to a one hour lunch and breaks as needed." Scott stated that Levy was "pretty flexible" with respect to breaks "as long as it isn't abused."

¶ 21    Martinez also testified, recalling that Scott had told him that Williams had called in a "74 campus wide" while eating and drinking at a table. Martinez testified that an audio recording

indicated that Williams had reported that she "was on a 74." However, unlike the prior hearing, the audio of Williams' purported radio signal was not played at the February 6, 2013 hearing.

¶ 22 Williams again testified at the February 6, 2013 hearing. Williams acknowledged that, as shown by the video footage, at about 1:15 a.m. she exited a 7-11 store and walked to a table where she joined a coworker and two individuals, whom she stated were IIT students. She testified that she went to the 7-11 because that store "had been robbed on the previous shift, and we were told in rol[l] call to keep vigilance over the store and *** keep visible that night because it had been robbed on the previous shift."

¶ 23 Williams testified that Levy had "call signs" to indicate an officer's activity, and that "[a] 73 is a special attention to a specific area," whereas "74 is patrolling [] campus wide." She claimed that when she left the 7-11 and arrived at the scene where she was recorded, she radioed to "ask[] for a 73," meaning "attention to a specific area." However, she claimed this had been "omitted from the video." She testified that her "73" call signal pertained to the area of "33rd and State Street and all surrounding areas." She claimed that she could see this area from the picnic table, and that the "73" signal "meant that I was alert and aware" and was "giving constant vigilance of that area."

¶ 24 Williams acknowledged that if she wanted to take a break, Levy's policy was that "we need to call a 10-7." Williams admitted she had not notified Levy that she wanted to take a break, either when she was in the 7-11 or when she was at the picnic table. However, she testified that she did not consider herself to be on break at the time. Instead, she testified: "I was stopped by the other employee and the students, and I joined them because they asked questions about the safety, the crime on the campus, how to be safe, and I was conducting customer service."

¶ 25    Williams denied that she ever radioed a "74" call sign to indicate she was patrolling at any point in the videotape's time frame.  She testified that she never used her radio during the time of the videotape, and "was only asked for my status when I arrived to the location, at no other time."   Similarly, she denied Scott's claim that there was an audio recording of her indicating a "74" at 1:25 a.m., while she was at the table.  Instead, she testified that when she left the table, she had signaled that she was going back to a "74" to patrol the campus.

¶ 26    On cross-examination, Williams acknowledged that she and her coworker had remained at the table even after the students had left the table around 1:33 a.m.  However, she claimed that after the students left, she was "watching the area" and discussed with her coworker "what we had talked about with the students."

¶ 27    On February 7, 2013, the referee issued a decision, which again concluded that Williams had been discharged for misconduct and was ineligible for unemployment benefits.  The referee's findings noted that Williams was "eating, smoking and engaging in conversation with a co-worker," from approximately 1:15 a.m. until 1:51 a.m.   The referee found: "[Williams'] testimony that she was engaged in surveillance activities at the nearby convenience store, that she was engaged in customer service by engaging in a discussion of  campus security with two students, and that she was engaged in surveillance activities *** while sitting at the table was completely at odds with the videotape."  The referee also noted that her testimony "was not in accordance with all of the other circumstantial evidence presented."

¶ 28    Williams filed an appeal to the Board.  On July 5, 2013, the Board issued a decision affirming the referee.  The Board's decision found that the record showed that Williams "was seated at the table for over 35 minutes," where she was eating, drinking and smoking.  The Board

decision states "[Williams] had notified the employer by radio that she was patrolling the entire campus at the time, and did not radio that she was taking a break."

¶ 29    The Board acknowledged that "[t]he claimant testified that at the time she was securing the specific location around the table, which included a convenience store that had been robbed recently."  However, the Board found that "the credible evidence has shown that the claimant took a break without notifying the employer that she was doing so, and instead falsely reported that she was patrolling the campus."  The Board also found that Williams' actions "harmed the employer by jeopardizing its contractual relations with [IIT], who expected the campus to be patrolled by security."  The Board thus found that "misconduct has been shown by the preponderance, and [Williams] is disqualified for benefits under section 602A" of the Act.

¶ 30    On July 11, 2013, Williams filed a *pro se* complaint[1] in the circuit court of Cook County for administrative review of the Board's July 5, 2013 decision.  The named defendants included the Department, the Director, the Board (together, the administrative defendants) and Levy. The Attorney General of the State of Illinois appeared on behalf of the administrative defendants, who filed an answer to the complaint on September 5, 2013.  On December 12, 2013, Williams filed her memorandum of law.  The administrative defendants filed their response on January 8, 2014.

¶ 31    On May 21, 2014, the trial court issued an "opinion and order" (the opinion) which reversed the Board's decision finding Williams ineligible for unemployment benefits.  The opinion included a brief statement of "facts" which credited Williams' testimony at the hearing. In particular, the opinion recited that "[Williams'] employer instructed her to 'keep vigilance over

---

[1]Williams subsequently retained counsel (who is also her counsel on appeal), who filed an appearance on October 9, 2013.

the [7-11] and *** keep visible that night because it had been robbed on the previous shift.' " The opinion's statement of facts similarly recites Williams' account of events that:

> "When she arrived at the 7-11, she informed dispatch that she was going to check the store. After the check, she requested a 73 on 33rd Street. Plaintiff proceeded to sit down at a nearby picnic table while keeping watch on the area.
>
> From 1:15 am until 1:33 am, Plaintiff conversed with another [public safety officer] and two IIT students. Plaintiff then cleared from that area and told Levy to clear her, after which she returned to a 74 status."

¶ 32 The trial court noted that Williams was discharged for "misconduct" under section 602(A) of the Unemployment Insurance Act, whose application "is a mixed question of law and fact," and thus it "will only reverse the Board's Decision if it is found to be clearly erroneous." The trial court then proceeded to find that the Board's decision was clearly erroneous. The court reasoned: "In its decision, the Board merely states that the convenience store had been robbed recently, ignoring testimony [from Williams] that Levy explicitly instructed [Williams] and the co-worker to 'keep vigilance over the [7-11] and *** keep visible that night because it had been robbed on the previous shift.' "

¶ 33 The trial court stated that it was "firmly convinced from the evidence that [Williams'] actions were not a deliberate or willful violation of a reasonable rule or policy when she was following explicit instruction from Levy." The court also concluded that Williams, "by following Levy's instruction, did not harm the employer by jeopardizing its contractual relations." The trial court noted that "[w]hile [Williams'] actions may be cause for termination,"

"a conclusion that they amounted to misconduct within the meaning of Section 602(A) is clearly erroneous."

¶ 34    On June 17, 2014, the administrative defendants filed a motion to reconsider, arguing that the trial court's conclusion conflicted with the factual findings of the Board. The motion to reconsider argued that the trial court had erred by "reweigh[ing] the evidence" and "credibility of the parties and substitute[d] its judgment" for that of the Board.  In response to the motion to reconsider, Williams argued that she could not be found to have committed a deliberate or willful violation of Levy's policy, where she was "following an explicit instruction from her supervisors" to be "vigilant" and remain "visible" in the area of the 7-11 store.  She argued that the Board's decision was clearly erroneous because the video footage showed that she was speaking to IIT students and "surveying the area," consistent with her testimony that she had requested a "73" to give special attention to the area.

¶ 35    The trial court denied the motion to reconsider on July 1, 2014.  The administrative defendants filed a notice of appeal on July 31, 2014.  Levy did not appeal.

¶ 36                                ANALYSIS

¶ 37    At the outset, we note that Williams argues the appeal must be dismissed for lack of jurisdiction.  Specifically, she argues that the administrative defendants—the Department, the Director, and the Board—"have no standing to prosecute this appeal."  She relies upon our supreme court's decision in *Speck v. Zoning Board of Appeals*, 89 Ill. 2d 482 (1985).  In *Speck*, our supreme court addressed an appeal taken by the Chicago zoning board of appeals (zoning board) after the circuit court reversed the zoning board's decision to approve a permit.  *Id.* at 484. The supreme court addressed the question of whether the zoning board lacked "standing to appeal a reversal of its own decision."  *Id.* at 485.  In holding that the zoning board lacked

- 10 -

standing, the *Speck* decision emphasized that the provisions of the zoning board's authorizing ordinance indicated that it was "intended to function in an adjudicatory or quasi-judicial capacity" but that the ordinance did *not* indicate that the zoning board was "authorized *** to assume the role of advocate for the purpose of prosecuting an appeal." *Id.* The supreme court concluded that the zoning board's "responsibility to protect the public interest does not authorize the Board to act as a representative of the public for the purpose of vindicating its own decision on appeal" and that "in assuming the role of advocate, the Board's required duty of impartiality is compromised." *Id.* at 486. The supreme court held that "a board like the one here lacks standing to prosecute an appeal from a reversal of its own decision." *Id.* at 486.

¶ 38    Williams argues that under *Speck*, the Department, the Director, and the Board lack standing to prosecute this appeal. However, Williams' standing argument was recently rejected by our supreme court in *Petrovic v. Department of Employment Security*, 2016 IL 118562.

¶ 39    As in this case, the plaintiff in *Petrovic* was denied unemployment benefits upon a determination by a Department referee, upheld by the Board, that she had been terminated "due to misconduct under section 602(A) of the Act." *Id.* ¶¶ 9-10. The circuit court reversed the Board's decision, finding that she was not terminated for "misconduct" within the meaning of section 602(A) because her employer had "failed to provide proof that plaintiff violated an express rule or policy." *Id.* ¶ 10. The appellate court reversed the circuit court and reinstated the Board's order denying benefits. *Id.* ¶ 11.

¶ 40    Our supreme court—before ultimately determining that the plaintiff was eligible to receive unemployment benefits—squarely rejected the plaintiff's preliminary argument that the administrative defendants in that case "had no standing to appeal the circuit court's judgment reversing the Board's denial of benefits." *Id.* ¶ 15. As in this case, the *Petrovic* plaintiff sought

to rely on *Speck* to argue that the administrative defendants "function solely in an adjudicatory or quasi-judicial capacity, which limits their capacity to appeal adverse decisions." *Id.* Our supreme court, however, reasoned that the holding in *Speck* "does not foreclose every appeal by an administrative agency seeking review of an adverse court judgment." *Id.* ¶ 17. Instead, our supreme court held, "an administrative agency with additional managerial functions beyond those of a tribunal is not subject to the 'normal rule that an administrative agency has no standing to appeal a decision reversing its own decision.' " *Id.* (quoting *Braun v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 108 Ill. 2d 119, 128 (1985)).

¶ 41    Our supreme court proceeded to explain that the Department has such additional managerial functions:  "In addition to its adjudicatory duties, the Department is specifically entrusted with administering the Act, preserving the fund, and handling its assets in accordance with the Act.  See 820 ILCS 405/1700, 2100(A) (West 2012).  Thus, the [administrative] defendants have independent interests in maintaining a uniform body of law involving the Act and protecting the fund." *Id.* ¶ 19.   Accordingly, the supreme court "reject[ed] plaintiff's contention that the [administrative] defendants lack standing to appeal the circuit court's decision on administrative review." *Id.*

¶ 42    We recognize that, after rejecting the plaintiff's standing argument, *Petrovic* nevertheless proceeded to find that the plaintiff was entitled to unemployment benefits, as her employer had "failed to offer evidence of a rule or policy" that was violated and thus "failed to meet its burden of proving that plaintiff was discharged for misconduct under section 602(A)." *Id.* ¶ 36. However, *Petrovic* is clearly dispositive of Williams' claim that the administrative defendants lacked standing to appeal the circuit court's reversal of the Board's decision against her.  We thus conclude that the administrative defendants have standing and we have appellate jurisdiction.

¶ 43    Separate from her standing argument, Williams contends that her due process rights to an impartial tribunal under the federal and state constitutions were violated.  Specifically, she asserts that the Board is not an impartial tribunal, since – upon a claimant's appeal to the circuit court from an adverse Board decision – the Board becomes a "partisan advocate" in defending its decision.  She urges that the Board's role as a party to an appeal from an administrative decision violates the principle "that the administrative role of *adjudicator*" should "never be combined with the role of *partisan* litigant."  (Emphases in original.)  She urges that the administrative defendants "ignored that command by becoming partisan litigants, and by engaging and communicating with, lawyers outside the [D]epartment [that is, the Attorney General's office] to advocate a defense of their decisions."  She further claims that this violates the "*ex parte* communications" provision of the Illinois Administrative Procedure Act, which requires that "agency heads, agency employees, and administrative law judges shall not, after notice of hearing *** communicate *** in connection with any issue of fact, with any person or party, or in connection with any other issue with any party or the representative of any party, except upon notice and opportunity for all parties to participate."  5 ILCS 100/10-60(a) (West 2012).

¶ 44    Williams further claims that the bias of the administrative defendants against claimants seeking unemployment benefits is evidenced by the fact that in "the vast preponderance of instances" when the administrative defendants choose to appeal a circuit court reversal of a Board decision, "they do so on behalf of employers and against claimants."  She claims that data shows that the administrative defendants "choos[e] to take appeals from adverse circuit [court] decisions for the cause [of] employers rather than claimants by a ratio greater than 12 to 1," and argues that such "data inescapably shows appellants' pro-employer bias."  While the data offered

by Williams in support of her argument seems to have some merit, for the following reasons, we reject Williams' due process claims.

¶ 45    We acknowledge that Williams is entitled to an impartial tribunal in an administrative hearing. "Administrative proceedings are not judicial proceedings, but the parties are entitled to a fair hearing before a disinterested tribunal." *Williams v. Board of Trustees of the Morton Grove Firefighters' Pension Fund*, 398 Ill. App. 3d 680, 694 (2010). "It is settled that an administrative hearing is not a partisan hearing with the agency on one side arrayed against the individual on the other. *** A fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence. [Citation.]" *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 94-95 (1992). However, "[w]ithout a showing to the contrary, State administrators are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." (Internal quotation marks omitted.) *Id.* at 95.

¶ 46    "The determination of whether an administrative hearing was fair and impartial requires a fact-specific analysis of the conduct of the board members before and during the hearing." *Williams*, 398 Ill. App. 3d at 693. "In order to demonstrate bias or prejudice, a claimant must show[] in the record that the administrative proceedings were either tainted by dishonesty or contained an unacceptable risk of bias. [Citations.] Bias may be indicated if a disinterested observer might conclude that the administrative body *** had in some measure adjudged the facts as well as the law of the case in advance of hearing it." (Internal quotation marks omitted.) *Wolin v. Department of Financial & Professional Regulation*, 2012 IL App (1st) 112113, ¶ 33.

However, "[a] mere possibility of prejudice is insufficient to show that a board, or any of its members, was biased." (Internal quotation marks omitted.) *Id.*

¶ 47 Notably, Williams does not argue any particular bias against her personally, or suggest any procedural impropriety during either of the hearings before the referee, or in the Board's review of the second hearing that lead to the Board's July 5, 2013 decision. Further, although she cites the general ban on *ex parte* communications by administrative defendants *during* administrative proceedings (5 ILCS 100/10-60(a) (West 2012)), she does not purport to allege any such improper communication during the administrative proceedings in her case.

¶ 48 Rather, Williams' argument appears to be that, since the administrative defendants will defend an appeal *after* a Board decision denying benefits, we should presume that the Board is biased against the claimants during the initial proceedings. However, we will not infer bias *during* the administrative proceedings merely from the fact that the Board may defend its decision at a later time. See *Jackson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 293 Ill. App. 3d 694, 699 (1997) ("A person challenging the impartiality of a tribunal must overcome the presumption that those serving on the tribunal are fair and honest. [Citation.] In the absence of personal bias demonstrated in the record, the mere combination of investigatory and adjudicatory functions will not render a tribunal biased in violation of due process."); *Caliendo v. Martin*, 250 Ill. App. 3d 409, 421-22 (1993) ("[I]t is not enough to complain merely that investigator, prosecutor, and adjudicator are all institutionally connected. [Citation.] This same complaint could be made in the majority of agency cases. Rather, plaintiffs must overcome a presumption of honesty and integrity in those serving as adjudicators by showing in the record that the administrative proceeding was either tainted by dishonesty or contained an unacceptable risk of bias." (Internal quotation marks omitted.)

¶ 49   Moreover, Williams' argument conflicts with express provisions of the Act and the Administrative Review Law which *require* the Department, the Director, and the Board to be made parties to an action seeking administrative review from a Board decision.  Section 1100 of the Act states that "[a]ny decision of the Board of Review *** shall be reviewable only under and in accordance with the provisions of the Administrative Review law" (820 ILCS 405/1100 (West 2012)).   In turn, the Administrative Review Law requires, "in any action to review any final decision of an administrative agency, the administrative agency and all persons, other than the plaintiff, who were parties of record to the proceedings before the administrative agency *shall be made defendants*."  (Emphasis added.)  735 ILCS 5/3-107 (West 2012).  Moreover, the Act specifically provides that "The Director shall be deemed to have been a party to any administrative proceeding before the Board of Review and shall be represented by the Attorney General in any judicial action involving any such decision."  820 ILCS 405/1100 (West 2012). This statutory provision directly undermines Williams' suggestions that the Attorney General's involvement in appeals from Board decisions runs afoul of the *ex parte* provision of the Administrative Procedure Act (5 ILCS 100/10-60(a) (West 2012)), or is otherwise a constitutional violation.

¶ 50   Finally, we note that Williams' argument suggests that we should find these statutory provisions unconstitutional, at least as applied when the administrative defendants appeal from reversals of Board decisions denying unemployment benefits.  However, it is well-settled that we presume all statutes constitutional.  *Bartlow v. Costigan*, 2014 IL 115152, ¶ 18 ("[S]tatutes are presumed constitutional, and the challenging party has the burden to prove the statute is unconstitutional.").  Just as we will not infer that the Board is biased against claimants because it may later be required to defend its decisions on appeal, we do not find that Williams has

overcome the presumption of constitutionality for the corresponding statutory provisions. Thus, we find Williams' due process arguments unavailing.

¶ 51 Having found that Williams' standing and due process challenges lack merit, we thus turn to the merits of the appeal.

¶ 52 "When a party appeals the circuit court's decision on a complaint for administrative review, the appellate court's role is to review the administrative decision rather than the circuit court's decision." *Petrovic v. Department of Employment Security*, 2014 IL App (1st) 131813, ¶ 24, *rev'd on other grounds*, 2016 IL 118562. " '[T]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct.' " *Id.* (quoting 735 ILCS 5/3-110 (West 2010)).

¶ 53 "In an appeal involving a claim for unemployment benefits, we defer to the Board's factual findings unless they are against the manifest weight of the evidence. [Citation.] An administrative agency's findings of fact are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. [Citation.] In our role as a reviewing court, we may not judge the credibility of the witnesses, resolve conflicts in testimony, or reweigh the evidence. [Citation.]" *Woods v. Illinois Department of Employment Security*, 2012 IL App (1st) 101639, ¶ 16.

¶ 54 The Board determined that Williams was ineligible for unemployment benefits pursuant to section 602(A) of the Act, which provides that "An individual shall be ineligible for benefits for the week in which he has been discharged for misconduct connected with his work and, thereafter, until he has become reemployed ***." 820 ILCS 405/602(A) (West 2012).[2] The Act

[2]"We note that section 602(A) has recently been amended. Pub. Act 99-488 (eff. Jan. 3, 2016) (amending 820 ILCS 405/602(A) (West 2014)). The amendment lists certain

defines "misconduct" to mean "the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit." *Id.*

¶ 55    Thus, our court has explained that: "Three main requirements must be met to establish misconduct under the Act.  It must be proven that (1) there was a deliberate and willful violation of a rule or policy of the employing unit, (2) the rule or policy was reasonable, and (3) the violation either harmed the employer or was repeated by the employee despite a previous warning or other explicit instruction from the employing unit."  *Woods*, 2012 IL App (1st) 101639, ¶ 19.

¶ 56    "Whether an individual was properly terminated for misconduct in connection with her work is a question that involves a mixed question of law and fact, to which we apply the clearly erroneous standard of review.  [Citation.]  An agency's decision is considered to be clearly erroneous where the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made." *Id.*

¶ 57    In this case, we conclude that the circuit court erred in reversing the Board's decision which found Williams ineligible for benefits.  That is, we do *not* find that the Board's decision was clearly erroneous in determining that Williams was terminated for "misconduct" within the meaning of section 602(A) of the Act.

---

circumstances under which an employee is disqualified from receiving benefits, 'notwithstanding' the definition of misconduct set forth in the statute.  However, because the instant case does not involve any of the enumerated circumstances, the language in the amendment is irrelevant to our analysis." *Petrovic*, 2016 IL 118562, ¶ __, n.1.

¶ 58    The circuit court properly recognized that the determination of "misconduct" was a mixed question of law and fact subject to a "clearly erroneous" standard of review.  However, in reaching its conclusion that it was "firmly convinced *** that [Williams'] actions were not a deliberate or willful violation of a reasonable rule or policy," it is apparent that the circuit court improperly engaged in reweighing the evidence, particularly the credibility of witness testimony.

¶ 59    In particular, the circuit court's opinion implicitly credited testimony by Williams when it criticized the Board for "ignoring" Williams' testimony "that Levy explicitly instructed [Williams] and the co-worker to 'keep vigilance over the [7-11] and *** keep visible that night because it had been robbed on the previous shift.' "  The circuit court's conclusion that the Board's decision was clearly erroneous was based upon Williams' testimony that "she was following explicit instruction from Levy."  In reaching this conclusion, the circuit court inherently made a credibility determination that Williams was truthful when she testified that she remained in the area due to instructions from Levy.  However, the Board was not required to accept her testimony, and it was not the circuit court's role to second-guess the Board's credibility determination.

¶ 60    Rather, keeping in mind that "as a reviewing court, we may not judge the credibility of the witnesses, resolve conflicts in testimony, or reweigh the evidence" (*Woods*, 2012 IL App (1st) 101639, ¶ 16), we cannot say we are left with any firm or definite conviction that the Board's conclusion was erroneous.  Rather, the Board could reasonably conclude that the "[t]hree main requirements" to establish misconduct under the Act had been met.  *Id.* ¶ 19.

¶ 61    First, the Board could reasonably determine that Williams had committed a "deliberate and willful violation of a rule or policy" of Levy, her employer.  *Id.*  Regarding the requisite proof of an underlying rule, we acknowledge that our supreme court has now rejected the notion,

previously accepted by our appellate court, that "a court may infer a rule violation 'by a commonsense realization that certain conduct intentionally and substantially disregards an employer's interests.' " *Petrovic*, 2016 IL 118562, ¶ 34 (quoting *Greenlaw v. Department of Employment Security*, 299 Ill. App. 3d 446, 448 (1998)). Our supreme court agreed that the "judicially created commonsense exception cannot be reconciled with the plain language in section 602(A), which clearly requires evidence of a deliberate violation of a reasonable rule or policy of the employer." *Id.* ¶ 35 (noting, however, that "evidence of a rule need not be shown where the employee's conduct would otherwise be illegal or constitute a *prima facie* intentional tort"). Nevertheless, this portion of the supreme court's holding in *Petrovic* does not change the outcome of Williams' appeal, as the finding that she violated a policy of her employer did not depend upon the "commonsense exception." Rather, in this case there *was* direct evidence in the record before the Board, including Williams' own testimony, that Levy had a policy requiring employees to request permission to take breaks. Further, Williams admitted that she had not requested a break for the relevant time period.

¶ 62 Moreover, the Board was free to find that Williams' testimony was incredible, to the extent that she claimed that she was *not* taking a break when she was videotaped at the picnic table. The Board's July 5, 2013 decision found that "the credible evidence has shown that the claimant took a break without notifying the employer that she was doing so, and instead falsely reported that she was patrolling the campus." This shows that the Board did not find Williams' testimony credible. We cannot say this conclusion was clearly erroneous.

¶ 63 Likewise, with respect to the second main requirement for a finding of misconduct, that "the rule or policy was reasonable," the Board could certainly conclude that Levy's policy against

unauthorized breaks was "reasonable" within the meaning of section 602(A) of the Act. See *Woods*, 2012 IL App (1st) 101639, ¶ 19.

¶ 64    Further, the Board could conclude that Williams' violation of Levy's policy caused Levy harm, satisfying the third main requirement to establish misconduct under section 602(A) of the Act. See *id.*   Notably, "[i]n determining whether an employer was harmed, the employee's conduct should be viewed in the context of potential harm, and not in the context of actual harm." (Internal quotation marks omitted.)  *Petrovic*, 2014 IL App (1st) 131813, ¶ 29.  The Board found such potential harm in this case, stating that Williams' actions "harmed the employer by jeopardizing its contractual relations with its client, who expected the campus to be patrolled by security."  We do not find this conclusion to be clearly erroneous.  Rather, the Board could easily conclude that Levy's contractual relationship with its client, IIT, could be jeopardized if IIT discovered that certain of Levy's employees were not performing security services in the manner expected under the contract.  Moreover, in the event that a crime should occur near a place and time when an assigned security officer was on an unauthorized break, it is easy to foresee a situation where Levy (or its client, IIT) might also be subject to potential tort liability.

¶ 65    In sum, we cannot say that the Board's conclusion that Williams was terminated for misconduct within the meaning of section 602(A) of the Act was clearly erroneous. Accordingly, the circuit court should not have disturbed the Board's July 5, 2013 decision.

¶ 66    Based on the foregoing reasons, we reverse the judgment of the circuit court of Cook County and reinstate the July 5, 2013 decision of the Board.

¶ 67    Reversed.