2020 IL App (1st) 192076-U

No. 1-19-2076

Order filed December 22, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| GREGORY SIMMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| THE DIRECT CHILD WELFARE | ) | |
| SERVICE EMPLOYEE LICENSE | ) | |
| BOARD OF THE ILLINOIS | ) | |
| DEPARTMENT OF CHILDREN AND | ) | No. 2019 CH 856 |
| FAMILY SERVICES; and BARBARA | ) | |
| SHULMAN,[1] DEPARTMENT | ) | |
| REPRESENTATIVE, OFFICE OF | ) | |
| THE INSPECTOR GENERAL OF | ) | |
| THE DEPARTMENT OF CHILDREN | ) | |
| AND FAMILY SERVICES, | ) | The Honorable |
| | ) | Sophia H. Hall, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

ORDER

_____

[1]Shulman was subsequently removed as a misjoined party.

¶ 1    *Held*: The administrative Board's decision to suspend the license of its child welfare employee was not against the manifest weight of the evidence nor unreasonable and arbitrary. This court affirmed the circuit court's judgment affirming the Board's decision.

¶ 2    Plaintiff Gregory Simms appeals from the circuit court's order affirming the decision of the Illinois Department of Child and Family Services (DCFS) Child Welfare Employee Licensure Board (Board) to suspend Simms' child welfare employee license for two years. The Board adopted the recommendations and opinion of the Administrative Law Judge (ALJ) that Simms had forged his supervisor's signature on child welfare forms during his tenure as a caseworker at Camelot Care Centers, Inc. (Camelot Care). On appeal, Simms contends the Board's decision was against the manifest weight of the evidence and the license suspension was unreasonable and arbitrary. We affirm.

¶ 3                                    BACKGROUND

¶ 4    The record shows that Simms was employed for 10 years, starting in 2007, at Camelot Care, a company contracted by DCFS to provide aid in returning abused and neglected children to their homes or placing them in foster care for adoption. See 20 ILCS 505/5(a)(3) (West 2016). Simms oversaw the cases of numerous children at a time. On their behalf, he would do home visits, attend court, document files, and refer children for various services. See *id*. He also had to complete a number of DCFS-mandated forms related to the children, and his supervisor Timberly Blandon had to place her final stamp of approval on these forms with her signature. In particular, Simms had to complete what's called an "Administrative Case Review" (Case Review) for each child. Included in the Case Review was the "Adoption and Safe Families Act Survey for Administrative Case Review," a form used to evaluate a child's placement goals, such as whether the child would be returned to his/her home or qualify for adoption. Another form was the "Education Profile Assessment," used to identify a child's educational background,

developmental history, and school placement. The present case arose after Simms was found to have forged Blandon's signature on these forms, resulting in his discharge from Camelot Care in January 2017.

¶ 5      Thereafter, the Office of the Inspector General (Inspector General) filed an administrative complaint on behalf of DCFS against Simms seeking to revoke his license for falsifying case records, insofar as he forged Blandon's signature on the official forms absent her authorization. See 20 ILCS 505/5c(a) (West 2016); 89 Ill. Admin. Code 412.50(a). Simms filed an answer denying that allegation. A hearing was subsequently held before an ALJ. The Inspector General called both Simms and Blandon as witnesses and then rested. Simms, who was represented by counsel, testified on his own behalf[2] and also called two witnesses in his defense, his former coworker, Shanika Alexander, and Camelot Care's former regional director (and supervisor to Blandon), Nicholas Szara, who was present at Simms' termination meeting. As his theory of defense, Simms acknowledged signing the documents but claimed he was authorized to do so.

¶ 6      Hearing testimony, in short, revealed the following. Blandon testified that she had weekly meetings with caseworkers during which time they would discuss any upcoming Case Reviews. The documents were either placed in her mailbox or brought to her. She would then review the forms for accuracy and sign them. Blandon testified that more than half the time, Simms came to these meetings without the Case Review forms. To remedy this, Blandon asked Simms to meet these deadlines and gave him extra office hours to catch up (Simms himself confirmed this testimony, noting that he never prepared the forms before the weekly meetings, although he discussed them with Blandon).

---

[2]Simms was the first witness to be called by the Inspector General. When it came time to cross-examine Simms, his counsel asked the ALJ whether he should simply conduct the "direct" examination of Simms, rather than recalling Simms to testify on his own behalf in his defense. The ALJ stated that it would be fine to "take care of everything all at one time."

¶ 7    Blandon testified that at some point before Simms' termination, she met with her five caseworkers, including Simms, and gave them permission to sign on her behalf, but only in an emergency (Simms' coworker, Alexander, testified contrarily this meeting was *after* Simms' termination). The caseworker could sign Blandon's name; place his initials next to it; and send an email stating that the caseworker had signed Blandon's name with his/her permission. The caseworker was then to print the email and attach it to the Case Review form. This was so the "administrative case reviewer" in charge of ultimately examining the Case Review knew the signature was authorized. Blandon testified that Simms never used this procedure, and Blandon never gave Simms permission to simply sign her name on documents. Additionally, he never asked to do so. To Blandon's knowledge, no other caseworkers signed for her absent authorization and only one used the emergency authorization procedure.

¶ 8    Simms, in contrast, testified that Blandon authorized him to sign Case Review forms on her behalf and did so in a rather carefree, routine manner. He stated that as of January 2016, one year prior to his termination, Blandon had informed him that she didn't always have time to sign his Case Review forms since she was acting as both a caseworker and supervisor, so she would allow him to sign for her. As a result, if he needed Blandon's signature, Simms would simply telephone Blandon and let her know that he'd signed for her and she was to "follow up," which he took to mean Blandon would either initial her signature or put dates by it. Simms added that Blandon told him, "I will double back and I will initial my — you know, my name or put the — finish the rest of it off and we'll go from there." Simms thus insisted that anytime he signed for Blandon, she had authorized it. He testified several other caseworkers also signed for Blandon. When asked if he was "familiar with the general practice when you sign someone else's name by putting your initials afterward," Simms said that he wasn't at the time of his employment, but

"Now I am." Simms added that the meeting wherein Blandon ordered a procedure for emergency signatures did not occur while he was employed at Camelot Care.

¶ 9      The Inspector General submitted the forms as exhibits A and B, and the witnesses testified about the signatures and dates on them. Simms pointed out that Blandon had added certain dates to the forms, while Blandon denied doing so.

¶ 10      As stated, the forged forms ultimately resulted in Simms' termination. At the termination meeting between Blandon, Szara, and a dialed-in human resources representative, Simms insisted that Blandon knew he signed the forms for her. Blandon offered similar testimony about his statements at the termination meeting. By contrast, Szara, who testified on Simms' behalf, asserted that at the termination meeting, Simms outright denied signing Blandon's name on the forms in question. In other words, when confronted with the forged forms, Simms told Szara, "I don't know what those are, I didn't do that."

¶ 11      Following the hearing, the ALJ issued a recommendation and opinion concluding that the Inspector General showed by a preponderance of the evidence that Simms falsified official records and did not have Blandon's authorization to sign the forms at issue. The ALJ found Simms' testimony as to the authorization was incredible and noted it was suspect that "none of the documents at issue" contained Simms' initials after Blandon's signature. The ALJ also found it incredible that Simms was unaware of the common practice of initialing next to a signature as a means of showing who actually signed the document. In addition, the ALJ found that when Szara confronted Simms about these forged signatures at the termination meeting, Simms denied signing Blandon's name on the documents. The ALJ found that if Simms' testimony in that regard were true, he would have explained to Szara that Blandon gave him permission. However,

the ALJ found that Simms did not do this, which showed a consciousness of wrongdoing on his part.

¶ 12    Although the ALJ found that Simms had never been disciplined and the rest of his Case Review forms were otherwise in order, the ALJ found the forged signatures posed a "significant" problem since such signatures promote accountability and show appropriate supervision. Thus, the ALJ recommended a 24-month suspension of Simms' license.

¶ 13    The Board accepted the ALJ's opinion and recommendation, thereby adopting its factual findings. Accordingly, Simms' license was suspended for 24 months. See 20 ILCS 505/5c(a) (West 2016) (noting, the Board has the authority "to revoke or suspend the license of anyone who after a hearing is found to be guilty of misfeasance"); 89 Ill. Admin. Code 412.50(a). Simms subsequently filed a complaint for administrative review in the circuit court. The circuit court affirmed the Board's decision, and Simms appealed.

¶ 14                                ANALYSIS

¶ 15    Simms first contends that the Board's suspension of his license was against the manifest weight of the evidence because the hearing testimony was unreliable. For the reasons to follow, we disagree.

¶ 16    On appeal, we review the Board's final decision, not the circuit court's. *Petrovic v. Department of Employment Security*, 2016 IL 118562, ¶ 22; *M.D. v. Department of Children & Family Services*, 2015 IL App (1st) 133901, ¶ 92. Under administrative review, an agency's fact findings are presumed *prima facie* true and correct. 735 ILCS 5/3-110 (West 2016); see also 20 ILCS 505/21(c) (West 2016) (noting, the administrative findings are subject to the Administrative Review Law). As such, a decision will be overturned only if it is against the manifest weight of the evidence, *i.e.*, where the opposite conclusion is clearly evident. *Lyon v.*

*Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004); *M.D.*, 2015 IL App (1st) 133901, ¶ 92. However, if there is anything in the record fairly supporting the agency's decision, then the decision is not against the manifest weight of the evidence and will be sustained on review. *L.F. v. Department of Children & Family Services*, 2015 IL App (2d) 131037, ¶ 47. In other words, this court will not reevaluate the Board's credibility rulings, resolve conflicts in the evidence anew, or substitute its judgment for that of the Board. *Woods v. Illinois Department of Employment Security*, 2012 IL App (1st) 101639, ¶ 16; *Raitzik v. Board of Education of City of Chicago*, 356 Ill. App. 3d 813, 823 (2005).

¶ 17    Here, the Board's factual findings that Simms forged his supervisor's signature on official documents, absent her authorization, and then lied about it during his termination meeting are not against the manifest weight of the evidence. See 20 ILCS 505/5c(a) (West 2016); 89 Ill. Admin. Code 412.50(a). As set forth, the Board adopted the factual findings of the ALJ, and therefore it's appropriate to review the findings of fact made by the ALJ and the hearing. See *Petrovic*, 2016 IL 118562, ¶ 22; 89 Ill. Admin. Code 412.60(p)(2)(A). Blandon testified unequivocally that she did not authorize Simms to sign the identified forms on her behalf. Rather, she testified there was a particular procedure to doing so, including the aforementioned initialing, but Simms did not follow that procedure. And, in fact, the forms entered into evidence did not contain Simms' initial after Blandon's purported signature, nor was there documentation attached to the form clarifying that Simms had signed for Blandon. While Simms offered testimony from a coworker that these procedures were not in place during his employment, the ALJ apparently did not believe that testimony. Deferring to the ALJ, and therefore the Board's decision, we cannot say the opposite conclusion was clearly evident or the decision was against

the manifest weight of the evidence. See *Lyon*, 209 Ill. 2d at 271; *M.D.*, 2015 IL App (1st) 133901, ¶ 92.

¶ 18    Simms nevertheless argues that adding initials as a notation of signing for another was not a fact in evidence and therefore the ALJ improperly relied on it in reaching its decision. Aside from Simms' failure to raise this matter before the ALJ or Board, thus forfeiting it, we disagree.[3] See *Chicago Teachers Union, Local 1, American Federation of Teachers, AFL-CIO v. Chicago School Reform Board of Trustees*, 338 Ill. App. 3d 90, 103 (2003) ("For purposes of administrative review, a party waives review of arguments not raised before the administrative agency."). Blandon's testimony suggested this was a common practice and Simms was expressly asked about it by the Inspector General. Likewise, Simms testified that in January 2016, Blandon informed him that if she wasn't able to sign the form, he could do so, and she would "follow up," which he took to mean she would initial her name or put dates on it. From this, the ALJ could reasonably infer he was familiar with this process but not entirely candid, and the Board in fact adopted this finding. Moreover, the ALJ findings were consistent with the relaxed evidentiary rules in administrative hearings. See *Robelet v. Police Pension Fund of City of Crystal Lake*, 2017 IL App (2d) 170306, ¶ 28.

¶ 19    Simms also makes much of the fact that the ALJ chose to believe Szara's testimony about the termination meeting that Simms outright denied signing Blandon's name on the forms. Simms argues that this conflicted with both his and Blandon's testimony as to the meeting that

---

[3]Simms argues in his reply brief that DCFS "waived the waiver" by failing to respond to his evidentiary and licensing arguments raised in the circuit court in his complaint for administrative review. We disagree. In arguing waiver, Simms relies on a case that is not dictated by administrative review law. Likewise, his waiver argument does not take into account that the administrative agency (not the circuit court) has the earliest opportunity to correct any errors, and as such, that is where the record must be developed. Since Simms did not develop the record at the agency level as to his specific evidentiary and licensing arguments, he has waived them before this court.

he did in fact admit to signing the forms but with her authorization. However, a fact finder may accept or reject all or part of a witness's testimony. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85; *Morgan v. Department of Financial and Professional Regulation*, 388 Ill. App. 3d 633, 658 (2009). It is for the fact finder to judge how flaws in parts of a witness's testimony, including inconsistencies, affect the credibility of the whole. *Id*. The ALJ evidently found that Szara better remembered the events at the termination meeting given that he oversaw it and chose to believe him. It is not for this court to challenge such a credibility finding. See *Williams v. Department of Employment Security*, 2016 IL App (1st) 142376, ¶¶ 59-60; see also *Grafner v. Department of Employment Security*, 393 Ill. App. 3d 791, 796 (2009) (it is an insufficient basis to reverse the agency's factual finding just because this court may have made a different finding based on the same evidence).

¶ 20     Even absent Szara's testimony, however, we find the evidence against Simms was sufficient to find that the Inspector General proved by a preponderance of the evidence, as required, the grounds for Simms' license suspension. See 89 Ill. Admin. Code 412.60(g)(1). In other words, based on the evidence, it was more probable than not that Simms forged Blandon's signature absent her authorization. See *In re K.O.*, 336 Ill. App. 3d 98, 107 (2002) (defining preponderance of evidence).

¶ 22     Last, Simms challenges the Board's decision to suspend his license for 24 months. We review an agency's disciplinary decision under an abuse of discretion standard. *Kazmi v. Department of Financial & Professional Regulation*, 2014 IL App (1st) 130959, ¶ 21. We will uphold the Board's disciplinary decision unless it was unreasonable, arbitrary, or unrelated to the purpose of the relevant statute. *Parikh v. Division of Professional Regulation of the Department of Financial and Professional Regulation*, 2014 IL App (1st) 123319, ¶ 34.

¶ 23    Simms argues the sanction was overly harsh. Again, aside from Simms' failure to raise this matter appropriately below, thus forfeiting it, we disagree. See *Chicago Teachers Union*, 338 Ill. App. 3d at 103. As set forth, the relevant statute and administrative rules provided that the Board could suspend Simms' license for falsifying records. See 20 ILCS 505/5c (West 2016); 89 Ill. Admin. Code 412.50(a). Here, consistent with the ALJ, the Board chose to suspend Simms' license rather than revoke it as urged by the Inspector General. The ALJ acknowledged that Simms had no prior employment issues, but believed a false signature was significant. The ALJ stated, "when signatures are taken lightly, [an] important measure of accountability is lost." Given the serious nature of Simms' work finding appropriate placement and services for abused and neglected children and the ALJ's findings, we cannot say the license suspension period was unduly harsh or inconsistent with the spirit and purpose of the law. See *Abrahamsson v. Illinois Department of Professional Regulation*, 153 Ill.2d 76, 99 (1992) (a reviewing court defers to the administrative agency's expertise and experience in determining what sanction is appropriate to protect the public interest). The ALJ, and therefore the Board, did not abuse its discretion.

¶ 24                                CONCLUSION

¶ 25    We affirm the judgment of the circuit court affirming the Board's decision.

¶ 26    Affirmed.